# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No. 14-M-1229
5803 N. 39th Street Milwaukee, Wisconsin )
)
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A.

located in the _____Eastern_____ District of _____Wisconsin_____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Sections 841, 843 and 846 | Conspiracy to obtain a controlled substance by fraud and illegal distribution of heroin and oxycodone |

The application is based on these facts:

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Scott Simons, Task Force Officer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5/30/14 @ 2:10 p.m.

_____
*Judge's signature*

City and state: Milwaukee, Wisconsin

William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANTS

Task Force Officer Scott Simons, being first duly sworn on oath, on information and belief says that:

## I. BACKGROUND AND EXPERIENCE

1. I am a Task Force Officer assigned to the Milwaukee Office of the Drug Enforcement Administration (DEA). I have worked full-time as a Federal Task Force Officer for the past 1 year and a full-time law enforcement officer with the Greenfield Police Department for the past 12 years.

2. During my tenure as a DEA Task Force Officer and a Greenfield Police Department law enforcement officer, I have been involved in the investigation of narcotics traffickers operating not only in the County of Milwaukee and the State of Wisconsin. I have received training in the investigation of drug trafficking. I have worked with informants in the investigation of drug trafficking in the Milwaukee area as well as other jurisdictions within the State of Wisconsin. I have participated in the application for and execution of numerous search warrants. I have participated directly in numerous narcotics investigations and arrests in which controlled substances and drug paraphernalia were seized. I am familiar with methods that are commonly used by drug dealers to package and prepare controlled substances for sale in the Milwaukee area.

3. I have not included in this affidavit each and every fact known to me regarding this investigation, but only those relating to determining whether there is probable cause to believe that items seized will be found in the places to be searched and whether those items are evidence of the offenses identified in this affidavit.

4. Based on my training, experience and participation in drug trafficking investigations, I know and have observed the following:

   a. I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other area of the United States;

   b. I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded and coded. I also know the various code names used to describe controlled substances;

   c. I know drug dealers often put telephones in the names of others (nominees) in order to distance themselves from telephones that they use to facilitate drug distribution. Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done using a telephone number and then are unable to put another line in the name of that subscriber;

   d. I know drug traffickers often purchase and/or title assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in the names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

   e. I know drug traffickers must maintain on-hand large amounts of U.S. currency in order to maintain and finance their ongoing drug business;

   f. I know it is common for drug traffickers to maintain books, records, receipts, notes ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances. The aforementioned book, records, receipts, notes, ledger, etc., are maintained where the traffickers have ready access to them. These may be in paper form as well as in digital form on computers, Smartphones, cellphones, and other electronic media or electronic storage devices;

   g. I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

   h. I know it is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, passbooks, letters of credit, bank drafts, cashier's checks, bank checks, safe deposit box keys and money

2

wrappers. These items are maintained by the traffickers within residences, businesses or other locations over which they maintain dominion and control, as well as in digital form on computers, Smartphones, cellphones, and other electronic media or electronic storage devices;

i. I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), pagers, computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

j. I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency;

k. I know drug traffickers commonly maintain addresses or telephones numbers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization in papers and books as well as in digital form on computers, Smartphones, cellphones, and other electronic media or electronic storage devices; and

l. I know drug traffickers take or cause to be taken photographs or videos of themselves; their associates, their property and their drugs. These traffickers usually maintain these photographs or videos in their possession, often in digital form on computers, Smartphones, cellphones, and other electronic media or electronic storage devices.

m. I am familiar with computers, cellular telephones, Smartphones, pagers and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers; Drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing, whether in the form of voicemail, email, text messages, video and audio clips, floppy disks, hard disk drives, thumbnail drives, CD's, DVD's, optical disks, Zip disks, flash memory cards, Smart media and any data contained within such computers or cellular telephones, electronic storage media and other settings particular to such devices; I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices.

n. I know the following information can be retrieved to show evidence of use of a computer or Smartphone to further the drug trade: system components, input devices, output devices, data storage devices, data transmission devices, and network devices

and any data contained within such systems; computer media and any data contained within such media; operating system software, application or access program disks, manuals, books, brochures, or notes, computer access codes, user names, log files, configuration files, passwords, screen names, email addresses, IP addresses, and SIM cards.

## II. LOCATION(S) FOR WHICH SEARCH WARRANT IS SOUGHT

5. As detailed below, there is probable cause to believe that within the upper unit of a duplex with the street address of 5803 N. 39th Street Milwaukee, Wisconsin (more fully described in Attachment A, hereinafter "target premises") are items that constitute evidence of drug trafficking as described in Attachment B.

## III. PROBABLE CAUSE

6. The Drug Enforcement Administration is investigating NORMAN BROWN for Conspiracy to Obtain a Controlled Substance by Fraud and Illegal Distribution of oxycodone (a Schedule II Controlled Substance), which are violations of Title 21, United States Code, Sections 841, 843, and 846. I believe evidence of these violations as described in Attachment B will be found in NORMAN BROWN's residence, the upper unit at 5803 North 39th Street Milwaukee, Wisconsin – described in Attachment A.

7. This investigation is based on information obtained from other federal, state and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Additionally, information has been obtained from interviews of cooperating defendants, informants, and cooperating citizen witnesses. I believe that the information from these non-law enforcement sources is reliable for the reasons set forth below.

8. In October 2013, Renee Pohle, a citizen witness, provided information to SA Janene Spitaletto that NORMAN BROWN has been producing forged prescriptions and paying multiple people to fill these forged prescriptions. Pohle advised that she used to live with

4

NORMAN BROWN for a few months during the summer of 2013, where she saw him commit these acts and that she filled forged prescriptions for him. Pohle identified NORMAN BROWN in a Wisconsin Department of Transportation photograph.

9. On January 18, 2014, Franklin Police Department received a telephone call from CVS Pharmacy in Franklin, WI reporting that a Robert Lathom was currently in the pharmacy attempting to fill a forged oxycodone prescription purportedly signed by Dr. Christopher Withers. Franklin Police Officer Scott Blaszczyk located and arrested Lathom at the pharmacy. Lathom did admit to attempting to fill this forged prescription and said a male subject named "NORMAN" provided him with the prescription and drove him to the pharmacy to fill the prescription. "NORMAN" warned Lathom that the police were at the pharmacy and "NORMAN" left without Lathom. I know from personal observation and from CS#1 statements that this prescription Lathom attempted to fill is similar in doctor name and medication type, quantity, and dosage to many forged prescriptions NORMAN BROWN has been producing.

10. A confidential source (hereinafter CS #1) has identified NORMAN BROWN through a Wisconsin Department of Transportation photograph. CS #1 has conducted one, consensually-recorded conversation with NORMAN BROWN at my direction. CS #1 has conducted one controlled purchase of a forged oxycodone prescription from NORMAN BROWN and CS #1 has conducted additional controlled meetings with NORMAN BROWN in which NORMAN BROWN provided CS#1 with forged oxycodone prescriptions. CS #1's information concerning NORMAN BROWN has been corroborated by other witnesses, physical surveillance, a controlled drug purchase, and consensually-recorded conversations and phone call that CS #1 has had with NORMAN BROWN. CS#1 has identified numerous other persons involved in this forged prescription investigation which has been corroborated by other witnesses

5

and defendants. To my knowledge, CS #1's information has never been found to be false or misleading. CS #1 is cooperating in an attempt to earn consideration on potential charges of Conspiracy to Obtaining a Controlled Substance by Fraud(oxycodone) and Illegal Distribution of oxycodone (a Schedule II Controlled Substance). For these reasons, I consider CS #1 to be reliable.

11. On May 23, 2014, CS#1 told me that NORMAN BROWN said he would have a forged oxycodone prescription ready at NORMAN BROWN's house to provide to CS#1 and that NORMAN BROWN may have the forged prescription in his mailbox for CS#1. CS#1 said he/she knew from prior meetings with NORMAN BROWN that NORMAN BROWN resides in the upper unit of a duplex which is 5803 N. 39th Street Milwaukee, Wisconsin. CS#1 was told by NORMAN BROWN to fill the prescription in exchange for CS#1 getting to keep half the quantity of pills and returning the other half to NORMAN BROWN.

12. On May 23, 2014, I followed CS#1 to the target premises at 5803 N. 39th Street Milwaukee, Wisconsin. SA Janene Spitaletto observed CS#1 walk towards the door of the target premises. CS#1 walked to the mailbox located on the side of the target premises and removed an envelope. CS#1 turned the envelope over to me and I found that it contained a forged oxycodone prescription. This forged prescription was on legitimate light blue colored prescription paper. I confirmed this was a forged prescription. CS#1 contacted NORMAN BROWN later this date and told NORMAN BROWN the pharmacy refused to fill the prescription for unknown reasons and as a result CS#1 did not obtain prescription pills.

13. On May 27, 2014, at my direction, CS#1 contacted NORMAN BROWN and asked for another oxycodone prescription with a specific patient name, date of birth, and address

6

that I provided. On May 27, 2014, CS#1 conducted a controlled buy[1] from NORMAN BROWN. I met with CS#1 and followed CS#1 to the target premises to meet with NORMAN BROWN. SA Janene Spitaletto watched CS#1 walk towards the rear door which is used to access the target premises. A short time later, SA Janene Spitaletto observed CS#1 walk back from the area of this rear door. I met with CS#1 who provided me with a light blue colored prescription on legitimate prescription paper. This prescription was written out for oxycodone pills to the specific patient name, date of birth, and address that I had requested and purportedly signed by a physician. CS#1 stated he/she met with NORMAN BROWN inside the target premises and obtained the forged prescription from NORMAN BROWN. Affiant watched video from an audio/video recorder CS#1 was equipped with. This video shows CS#1 meeting with a black/male subject, then walking upstairs and into the target premises. This black/male subject fit the physical description -- size, height, race, sex -- of NORMAN BROWN

14. On the same date, at my direction, CS#1 met with NORMAN BROWN a short time later at the target premises to make a payment to NORMAN BROWN instead of providing NORMAN BROWN with the other half of the prescription pills. I followed CS#1 to the target premises. SA Janene Spitaletto observed NORMAN BROWN come from the area of the rear door, which is used to access the target premises, and then enter the vehicle of CS#1. SA Janene Spitaletto identified NORMAN BROWN from a Wisconsin Department of Transportation photograph. A short time later, NORMAN BROWN exited the vehicle of CS#1 and walked back to the rear door of the target premises. CS#1 then met with affiant and said he/she paid

---

[1] A "controlled buy" is a law enforcement operation in which an informant purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and monitoring device. When the transaction is completed, the informant meets case agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money. Additionally, all telephone calls made by the informant while under the direction and control of case agents are recorded.

NORMAN BROWN with prerecorded buy money for NORMAN BROWN's half of the prescription pills as if CS#1 had filled the prescription at a pharmacy and obtained the prescription pills. CS#1 also said NORMAN BROWN gave CS#1 another forged oxycodone prescription made out to patient Renee Pohle and asked CS#1 to pickup Pohle and drive her to a pharmacy to fill the forged prescription. Affiant reviewed audio/video of this interaction from a recorder that CS#1 was equipped with and observed CS#1 had the prerecorded buy money to NORMAN BROWN.

15. On this same date of May 27, 2014, agents and I followed CS#1 as he/she drove to Pohle. Agents and I then followed CS#1 as he/she drove Pohle to an Aurora Pharmacy in Waukesha County. SA Enrique Carlton observed Pohle exit the vehicle of CS#1 and walk into the pharmacy. Oconomowoc Police Officers responded and arrested Pohle inside the pharmacy for attempting to fill this forged oxycodone prescription.

16. On May 28, 2014, I spoke with Wisconsin Probation/Parole Agent Mary Ann Richards who confirmed NORMAN BROWN is on probation and resides at the target premises which is accessed by the rear door. NORMAN BROWN also reported his cellular telephone number to Probation/Parole as (414) 323-4835 which is the telephone number CS#1 called to communicate with NORMAN BROWN.

17. Affiant knows from personal observation that 5803 N. 39th Street, Milwaukee, Wisconsin is the upper unit of a two-story, two family residence (upper/lower) with tan brick, off-white siding, brown trim, a brown shingled roof, and includes a detached garage. The numbers "5803" are prominently displayed (black numbers on white background) on the tan stone siding to the left of the front door which faces east. The door to access 5803 N. 39th Street, Milwaukee, Wisconsin is located on the rear of the residence which faces west.

18. On May 19, 2014, I checked Wisconsin Department of Transportation records which show NORMAN BROWN resides at the target premises. Other agents and I have conducted surveillance of the target premises over the past couple weeks and observed NORMAN BROWN on the property of the target premises multiple times.

19. CS#1 told me that NORMAN BROWN resides alone in the target premises and has a second bedroom NORMAN BROWN uses to produce forged prescriptions and forged checks for the past three months. In this second bedroom, CS#1 has observed two computers, two printers, multiple flash drives, an external hard drive, and blank light blue prescription papers. CS#1 told me that within the past month, NORMAN BROWN has had oxycodone prescription pills obtained from forged prescriptions inside the target premises as well as small quantities of heroin. CS#1 stated NORMAN BROWN is a heroin user and CS#1 knows this because CS#1 has assisted NORMAN BROWN in obtaining heroin as recent as one to two months ago and NORMAN BROWN told CS#1 that NORMAN BROWN used heroin on May 27, 2014. Affiant knows from personal observation that the majority of computer generated forged prescriptions related to this investigation are light blue in color.

## IV. CONCLUSION

20. Based on the forgoing, I believe there is probable cause to believe located in the location described in Attachment A, there is evidence of drug trafficking and fruits, instrumentalities and proceeds of drug trafficking, all of which is detailed more specifically in Attachment B, Items to be Seized.

## ATTACHMENT A – LOCATION TO BE SEARCHED

**5803 N. 39th Street, Milwaukee, Wisconsin**, more particularly described as a two-story, two family residence (upper/lower) with tan brick, off-white siding, brown trim, a brown shingled roof, and includes a detached garage. The numbers "5803" are prominently displayed (black numbers on white background) on the tan stone siding to the left of the front door which faces east. The door to access 5803 N. 39 Street, Milwaukee, Wisconsin is located on the rear of the residence which faces west.

# ATTACHMENT B – ITEMS TO BE SEIZED

1. Proceeds of drug trafficking activities, such as United States currency, precious metals, financial instruments, and jewelry, and documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other items obtained with the proceeds from drug trafficking activities.

2. Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, bank statements, safe deposit box keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances.

3. Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed.

4. Personal telephone books, address books, telephone bulls, photographs, letters, cables, telegrams, facsimiles, personal notes, documents and other items or lists reflecting names, addresses, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in drug trafficking activities.

5. Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities.

6. Cellular telephones, SmartPhones, pagers, text messaging systems, computers, laptops, printers, and other communication devices, any and all records associated with such communications services, and all electronic data/content contained within these devices for information described in this Attachment.

7. Indicia of occupancy, residency or ownership of the premises and things described in the warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents and keys.

8. Photographs, videotapes or other visual depictions of assets, coconspirators, or controlled substances.

9. Prescription paper, prescription pads, or any other materials used to produce forged prescriptions.

10. Oxycodone, heroin, heroin packaging materials, scales, materials for cutting heroin to increase quantity.